**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOSEPH A. CANTELE and AMY CANTELE, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | No. 15-CV-00074 |
| | ) | |
| CITY OF BURBANK, a municipal corporation; | ) | Judge John J. Tharp, Jr. |
| EMPLOYEE 6024 a/k/a UNIT B818 a/k/a | ) | |
| JOHN GOLDEN; and EMPLOYEE 6086 a/k/a | ) | |
| UNIT B816 a/k/a OFFICER FITZMAURICE, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Joseph and Amy Cantele bring this complaint under 42 U.S.C. § 1983 against the City of Burbank ("the City") and police officers John Golden and Robert Fitzmaurice alleging that on January 8, 2013 the defendants forcibly removed them from their home, depriving them of constitutional protections afforded under both the Fourth and Fourteenth Amendments of the United States Constitution.

Before the Court is the defendants' motion to dismiss the Canteles' first amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The Canteles' amended complaint contains two counts. The first alleges that the defendants' conduct deprived them of due process of law in violation of the Fourteenth Amendment. Am. Compl., ECF No. 13, ¶¶ 23-51. The complaint does not specify whether the Canteles allege a procedural or substantive due process violation; however, in its motion to dismiss the defendants fight a two-front war and challenge both theories. Mot. to Dismiss, ECF No. 14, 3-6. Invoking the *Parratt-Hudson* doctrine, they maintain that a procedural due process claim cannot stand because

any misconduct Golden and Fitzmaurice engaged in was "random and unauthorized" conduct for which Illinois provides an adequate post-deprivation remedy. *See Parratt v. Taylor*, 451 U.S. 527, 531 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986); *Hudson v. Palmer,* 468 U.S. 517, 533 (1984). On the substantive due process front, the defendants argue that the Canteles' allegations fail as a matter of law because there is no independent constitutional violation. This argument turns on the viability of Count II of the Canteles' complaint, which asserts that the defendants seized their home in violation of the Fourth Amendment when Golden and Fitzmaurice allegedly forced them to leave the premises. ECF No. 13, ¶¶ 52-60. In response, the defendants argue that no seizure occurred and, in the alternative, that Golden and Fitzmaurice are entitled to qualified immunity. ECF No. 14, 12-13. As for the City, the defendants argue that the City is not liable under a *Monell* theory because the officers' actions were not conducted pursuant to an official policy or custom. *Id.* at 14-15.

For the reasons stated below, the defendants' motion is granted in part and denied in part. The Canteles may proceed with their Fourth Amendment claim against Golden and Fitzmaurice in their individual capacities. But their due process claim is dismissed without prejudice as to all defendants, and their Fourth Amendment claim against the City is dismissed without prejudice as well.

**BACKROUND**

Throughout 2012 the Canteles sought building permits from the City of Burbank to make repairs on their rent-to-own residence located at 8400 Lockwood Avenue in Burbank, Illinois. Building inspectors from the City met the Canteles at their home and indicated to the Canteles that they would need permits to complete their desired projects. On December 20, 2012 the Canteles attended a hearing at the City of Burbank Police Department where the City informed

the Canteles that there were additional steps they needed to take with respect to their home in order to comply with City code by the date of the next hearing, February 7, 2013.

According to the Canteles, however, the City then short-circuited this process. They allege that on January 8, 2013, "the City" arrived at the Canteles' home and began banging on their front door. ECF No. 13, ¶ 24. The Canteles called the police and requested assistance due to "the suspicious vehicles and banging on the door"; they do not, however, explain why they believed that there was anything "suspicious" about a visit by city officials or why such a visit warranted a call to the police. *Id.* at ¶ 25. In any event, in response to the Canteles' call, defendant police officers Golden and Fitzmaurice, and two other unidentified officers, arrived at the Canteles' home a few minutes later. By this time, "the City" representatives were gone.

The officers approached the home and knocked on the door. When Amy Cantele answered the door, the Canteles allege, she was ordered to produce identification. *Id.* at ¶ 31. The identification she provided indicated that she lived at the Lockwood Avenue home. The officers were not let inside the home. The Canteles maintain that, at some point while the officers were at the Canteles' residence, Golden "and/or" Fitzmaurice then made contact "with the City's Building Commission" and were instructed to remove all residents from the property. The Canteles' complaint does not identify who gave this instruction to the officers, but they allege that Golden and Fitzmaurice then ordered that everyone inside the home leave or be removed forcibly. The Canteles, another unnamed adult, a two-year old, and an infant complied and left the premises in response to this directive. *Id.* at 36. Golden and Fitzmaurice then told Amy Cantele that the group could not reenter the residence until further notice, and that they "would take further action against anyone who attempted to reenter the property." *Id.* at ¶ 40. The City

then stationed a squad car at the end of the block to ensure that they could not return to their home. *Id.* at ¶ 41.

At some point after they were removed from the house, the plaintiffs spoke with "Dave," an employee of the City, who told them that they "could not be in the house due to a 'sticker' that was placed on the subject property." *Id.* at ¶ 45. That evening, the Canteles contacted Lieutenant Hansen with the City of Burbank Police Department. He informed the Canteles that they could return to their residence. *Id.* at ¶¶ 53-54.

## ANALYSIS

A motion under Rule 12(b)(6) challenges a complaint's sufficiency to state a claim upon which relief may be granted. In considering the defendants' Rule 12(b)(6) motion, the Court accepts as true all of the allegations in the complaint and draws all reasonable inferences in favor of the plaintiffs. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A federal complaint should be "a short and plain statement of the claim showing the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). But however short and plain, it must contain sufficient detail to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 554. And it must have sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* At 570. The Court disregards boilerplate legal conclusions. All told, the factual allegations "must be enough to raise a right to relief above the speculative level." *Id.* at 554. With these foundational principles in mind the defendants' arguments are addressed in turn below.[1]

---

[1] In setting forth the standard governing motions to dismiss, Plaintiffs' opposition brief cites the "no set of facts" language from *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) that the Supreme Court expressly "retired" in *Twombly* some nine years ago. *See* 550 U.S. at 562-63 ("after puzzling the profession for 50 years, this famous observation has earned its retirement").

## A. The Procedural Due Process Claim

The first issue presented is whether the Canteles have crafted a plausible Fourteenth Amendment procedural due process claim. To prevail on a procedural due process claim, the Canteles must establish a (1) cognizable property interest, (2) a deprivation of that property interest, and (3) a denial of due process. *See Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). The defendants do not argue that the Canteles lacked a property interest in their home, nor do they contend that the Canteles were not deprived of that interest when they were told to vacate the premises. Instead, the defendants invoke the *Parratt-Hudson* doctrine, which holds that where a deprivation of liberty or property is the result of random and unauthorized conduct by a state actor, due process is satisfied where the state provides an adequate post-deprivation remedy. *Parratt*, 451 U.S. at 531. Under *Matthews'* pragmatic framework, *Parratt* makes sense because, as a practical matter, the state cannot provide notice and a hearing with respect to an act that would occur, if at all, unpredictably—*i.e.,* one that is "random and unauthorized." *Parratt,* 451 U.S. at 531; *Hudson,* 468 U.S. at 533. As the Supreme Court has explained, "*Parratt* and *Hudson* represent a special case of the general *Mathews v. Eldridge* analysis, in which postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide." *Zinermon,* 494 U.S. 113, 128 (1990).

The Canteles counter that their "eviction" was not random and unauthorized because someone with the City's Building Commission instructed the defendant officers to remove them from their home. That authorization, they contend, makes *Parratt* and its progeny inapposite. That the defendant officers are alleged to have been following the instruction of some other

---

Suffice to say that Counsel's reliance on a long-repudiated pleading standard does not enhance the persuasiveness of the brief.

government employee or official, however, does not necessarily render the *Parratt-Hudson* doctrine inapplicable. Rather, it begs the question of whether that government official was himself acting in a random and unauthorized manner or indeed had the lawful authority to remove the Canteles from their home without notice and hearing.

The Seventh Circuit addressed the question of when governmental officials should be deemed to have been acting in a "predictable and authorized" manner in *Easter House v. Felder*, 910 F.2d 1387 (7th Cir. 1990) (*en banc*). Easter House, an Illinois adoption agency, claimed that it had been deprived of due process by officials of the Illinois Department of Children and Family Services ("DCFS") who conspired to deny Easter House's application for renewal of its license without providing a hearing before doing so. *Id.* at 1390. Reviewing that claim, the Seventh Circuit considered (among other questions) the same issue presented by the Canteles' complaint, namely whether "the failure of high-level state employees, who are charged with providing the state's established due process protections, to grant admittedly practicable predeprivation relief automatically translates into an 'established state procedure' and thus is *per se* 'authorized'." *Id.* at 1398.[2]

Reviewing the Supreme Court's *Parratt-Hudson* doctrine in the light of the Court's then-recent opinion in *Zinermon v. Burch*, 494 U.S. 113 (1990), the Seventh Circuit concluded that the answer to this question turns on two related factors: the degree of discretion that the state has vested in the official and the extent to which that discretion is circumscribed by state law. *Easter House*, 910 F.2d at 1400. In *Zinermon*, the Supreme Court held that staff members at a Florida

---

[2] This question also implicates the subsidiary questions of who the official is, what discretion the state vested in that official's position, and what constraints the state imposed on that discretionary authority. Presumably, a desk clerk at the Building Commission would not be vested with discretion to authorize the removal of residents from their homes even if the Commission as a body, or more senior officials, were.

state hospital deprived the plaintiff of due process when they admitted him for mental health treatment on the basis of a voluntary consent form that he signed without an assessment of his competence to provide informed consent. 494 U.S. at 139. Critical to the Court's holding was its analysis of the state statute governing the admission of patients to mental health facilities. *See id.* at 136. Reviewing the statute, the Court concluded that in authorizing the relevant state officials to admit patients on consent, without prescribing a concomitant process to ensure the competence of such individuals to provide knowing and informed consent, the state had effectively provided the defendants with uncircumscribed discretion to admit such patients involuntarily without a hearing. *Id.* at 136-37. As the Seventh Circuit explained in *Easter House*, in *Zinermon* "the Court concluded that the actions of the [defendants] could not be characterized as 'unauthorized' in light of the authority they were given to effect the very deprivation complained of by the plaintiff." 910 F.2d at 1401.

What, then, does the complaint allege with respect to the nature and scope of the Building Commission's authority to remove residents from their homes? Nothing. Although the complaint repeatedly alleges that the defendant officers were directed by some unnamed member, or members, of the Building Commission, it includes no allegations that identify the source or extent of the Building Commission's authority generally, or more specifically its authority to remove the occupants of residential premises for code violations. In their response brief, the plaintiffs assert that the City "had an express policy with regard to building codes and enforcement" and that the "Building Commission was the final policymaking authority on the permits," ECF No. 21 at 11, but this amounts to little more than a conclusion. Neither the complaint nor the plaintiffs' brief identifies any statutory or regulatory source of the alleged

plenary power of the Building Commission, so the plaintiffs have failed to provide an adequate basis to assess the plausibility of their procedural due process claim.[3]

The complaint suggests, moreover, that whatever the source of the Building Commission's authority, the scope of that authority is circumscribed by a requirement to provide predeprivation notice. The complaint alleges that the City was providing hearings to the Canteles concerning the work required on their home. The plaintiffs' allegation, then, is not that the City refused to provide any hearing but rather that the defendants abandoned the hearing process when the Building Commission demanded that the Canteles vacate the residence before the alleged violations had been adjudicated. As set forth in the complaint, there is a required notice and hearing process the City must follow before evicting residents for code violations; the premise of the Canteles' claim is that the defendants did not comply with it.

---

[3] The Court offers two observations with respect to this deficiency. First, the City of Burbank appears to be a "home rule" unit of local government. Under Article VII, Section 6 of the Illinois Constitution, "any municipality which has a population of more than 25,000" is a home rule unit, and per its website, Burbank has a population of approximately 28,000. Home rule status gives municipal government the power to legislate in the absence of affirmative state law barring or preempting such action. *See* ICLE Illinois Municipal Law: Contracts, Litigation, and Home Rule, Chapter 7, Section 7.7 at 7-13: "The essence of home-rule power in Illinois with respect to matters pertaining to its government and affairs and absent preemption is that a home-rule unit (1) may act when no express statutory authority exists, (2) may act when statues suggest a restriction, and (3) may act in the face of or in contravention of proscriptive statutes." Second, the City has adopted a municipal code that includes myriad ordinances governing buildings and structures (Chapter 4). *See* Municipal Code of the City of Burbank, available at https://www2.municode.com/library/il/burbank/codes/code_of_ordinances?nodeId=CO (last visited April 29, 2016). The Court declines, however, to parse through the City's municipal code in order to identify the provisions that may be implicated by the facts alleged and claims asserted in this case, particularly where the plaintiffs have made no attempt to do so. As noted, the scope of, and limits on, the discretion afforded to state actors is highly relevant to the question of whether a state actor's conduct is random and unauthorized within the meaning of the *Parratt-Hudson* doctrine. It is, therefore, the responsibility of the plaintiff, who bears the burden of plausibly pleading a denial of due process, to identify the procedures relevant to that inquiry in the first instance.

To the extent that the plaintiffs seek to base liability on allegations that city officials disregarded the required hearing and adjudicatory process for resolving alleged building code issues, they cannot. "Where established state policy would provide adequate predeprivation process, and that policy circumscribes the discretion of state officials to act, a single act of a state official—even a high-ranking state official—that violates that established policy is random and unauthorized from the state's perspective." *Clifton v. Schafer*, 969 F.2d 278, 281-82 (7th Cir. 1992). *Easter House* compels this conclusion. There, the Court of Appeals held that the acts of the defendants were "random and unauthorized" where those officials "did not have the discretionary authority to revoke Easter House's interim operating status without proceeding through a series of procedural safeguards which included the holding of a formal predeprivation hearing." 910 F.2d at 1401. The actions of the officials in disregarding the procedures required by state law were, the court held, neither predictable nor authorized where the state had not vested the defendants with "broadly delegated, uncircumscribed power to effect the deprivation at issue." *Id.* at 1402.[4]

The same is true here, at least so far as the complaint presently alleges: rather than complete the required hearing process (whatever its source), city officials, including the defendants, abandoned that process and evicted the plaintiffs based on unadjudicated violations of the building code. Under *Parratt-Hudson, Zinermon,* and *Easter House,* that is random and unauthorized conduct that does not give rise to a claim under § 1983 for denial of due process. *See also, e.g.*, *Leavell v. Illinois Dep't of Natural Resources*, 600 F.3d 798, 806 (7th Cir. 2010)

---

[4] The plaintiffs rely on *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 435-36 (1982), in which the Supreme Court held that the *Parratt* doctrine was inapplicable and found a due process violation where a state statute by its terms expressly deprived the plaintiff of the right to a predeprivation hearing. *Logan* has no bearing here, where (so far as has been shown) no rights were deprived by operation of an established governmental procedure.

(failure of state agency to provide required notice and hearing before plugging abandoned oil wells was random and unauthorized act); *Hansen v. Cannon*, 122 F. App'x 265, 270 (7th Cir. 2004) ("eviction without a court order is a good example of 'random and unauthorized' action"); *Soldal v. County of Cook*, 942 F.2d 1073, 1075-76 (7th Cir. 1991) (*en banc*) (unlawful eviction as result of random and unauthorized acts of law enforcement "is not actionable under section 1983 unless the plaintiff lacks adequate judicial remedies under state law"), *rev'd on other grounds,* 506 U.S. 56 (1992) (see note 7, *infra*). And because the complaint provides no basis to infer that the conduct of the unknown Building Commission official(s) who purportedly authorized the Canteles' eviction was not random and unauthorized, there is similarly no basis to conclude that the actions of Officers Golden and Fitzmaurice were not random and unauthorized. Accordingly, the procedural due process claim against the defendant officers fails.[5]

The Canteles' procedural due process claim against the City fails for essentially the same reason: they have failed to state a *Monell* claim because they have offered no facts indicating that the defendant officers were acting pursuant to a government policy. "[M]unicipal liability exists only when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Calhourn v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005) (quoting *Monell v. N.Y. City Dep't of*

---

[5] As to the second prong of the *Parratt-Hudson* inquiry—whether the Canteles had an adequate postdeprivation remedy—the plaintiffs, again relying on *Logan*, offer only a single-sentence argument that post-deprivation state remedies do not satisfy due process because "the government procedure regarding permits and construction which was involved and led to the 'eviction' does not provide adequate remedies for the plaintiffs." [Dkt. 21 at 4.] That argument misses the point; the issue is not whether a statute implicated in the deprivation provides an adequate post-conviction remedy but whether other provisions of state law offer adequate remedies. Failing to offer any argument about the inadequacy of state tort law or other state law to provide a remedy for the brief eviction they allege, the Canteles have failed to avoid application of the *Parratt-Hudson* doctrine.

*Social Servs.*, 436 U.S. 658, 694 (1978)). Such a policy or custom can attributed to a municipality via an express policy that causes a constitutional deprivation; through a "widespread practice" that although not authorized by written law and express policy, is so permanent and well-settled as to constituted a "custom or usage" with the force of law; or through an allegation that the constitutional injury was caused by a person with "final policymaking authority." *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995).

But here, as discussed above, the complaint alleges only that the defendant officers, and perhaps some official or employee of the Building Commission, engaged, on a single occasion, in random and unauthorized conduct by pretermitting the code violation hearings that the City was conducting with the Canteles. That eliminates the first two species of *Monell* liability; as set forth above, the complaint fails to allege allegations plausibly suggesting that the City has either an express policy or widespread practice of evicting residents from their homes without a hearing due to building code violations.

That leaves only the third class of *Monell* claim, that a person with "final policymaking authority" caused the alleged constitutional deprivation. *McTigue*, 60 F.3d at 382. But as noted already, although the complaint alleges that **someone** at the Building Commission instructed the officers to act, and that the Building Commission is the final authority for the City with respect to building code issues, it does not identify any particular official or employee of the Commission who was involved in the decision to take action against the Canteles, much less plausibly allege facts that would establish their authority to unilaterally make policy for the City. *See, e.g, Estate of Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007) (noting plaintiffs proceeding under a *Monell* theory of liability must allege that the official in question was the final policymaker in the particular area raised in the case). The Canteles offer

no facts plausibly suggesting that the individual from the Building Commission was a decision maker or a high ranking City official. But even if they had, the fact that an individual occupies a position of authority does not make every act of that official the official policy of the City. As the Seventh Circuit observed in *Easter House*, "whether a state official ranks 'high' or 'low' in the state hierarchy . . . cannot by itself be dispositive." 910 F.2d at 1400. The officials' status only becomes dispositive if that status makes the "employee misconduct, which clearly contravenes established state policy and procedure as contained within formal rules, regulations, and statutes . . . the state's new position in all similar matters." *Id.* at 1402. The complaint alleges no facts indicating that the unnamed City employee who allegedly directed Officers Golden and Fitzmaurice to give the Canteles their marching orders was creating a new City policy to deprive residents of hearings regarding alleged code violations. Accordingly, the procedural due process claim against the City also fails.

## B. The Fourth Amendment Claim

The next issue presented is whether the Canteles have stated a viable Fourth Amendment claim. The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. A few well delineated exceptions aside, searches and seizures that are conducted without a warrant are presumptively unlawful. It is uncontested that Golden and Fitzmaurice arrived at the Canteles' home without a warrant. The defendants maintain, however, that nothing they did gave rise to constitutional seizure of the Canteles, nor did their actions result in a seizure of their home.

In arguing that the Canteles themselves were not seized within the meaning of the Fourth Amendment, the defendants are tackling a straw man of their own making. While it seems

intuitively correct that the Canteles were not seized—the test for seizure of a person being whether a reasonable person would have believed she was free to leave, while the Canteles maintain that they were not free to stay—the Canteles do not argue that the defendant officers seized them personally.[6] Rather, they argue that the defendants seized their residence when they ordered them to vacate the home and not to return until further order. And here, the Canteles have the better of the argument.

A seizure of a person's property occurs when there is some meaningful interference with an individual's possessory interests in that property. *See*, *e.g.*, *Soldal*, 506 U.S. at 61. Evicting someone from their home that they otherwise are in lawful possession of unquestionably interferes with their possessory interest in their property. *Id.* In *Soldal,* Sheriff's deputies had assisted the owner of a trailer park in removing a trailer from its rented lot before the owner had secured an eviction notice pursuant to the state's Forcible Entry and Detainer Act ("the Act"). The Supreme Court unanimously held that the protection of the Fourth Amendment was implicated when deputies barred the homeowner, Soldal, from interfering with the removal of the trailer. *Id.* at 58. By temporarily depriving Soldal of access to his home in that manner, the Court held, the deputies had unquestionably seized the home. *Id.* at 61 ("We fail to see how

---

[6] The Seventh Circuit noted in *Kernats v. O'Sullivan*, 35 F.3d 1171, 1177 (7th Cir. 1994) that the Supreme Court recognized in *Florida v. Bostick,* 501 U.S. 429, 435–36 (1991), that "when a person has no desire to leave the scene of an encounter with police, 'the degree to which a reasonable person would feel he or she could leave is not an accurate measure of the coercive effect of the encounter.' In such a situation, 'the appropriate inquiry is whether a reasonable person would feel free to decline the officer's request or otherwise terminate the encounter.'" As noted *infra*, the defendants' argument that the Canteles were free to decline their "request" to leave the home is quite a stretch.

being unceremoniously dispossessed of one's home in the manner alleged to have occurred here can be viewed as anything but a seizure invoking the protection of the Fourth Amendment.").[7]

*Soldal* plainly compels the conclusion that, in removing the Canteles from their residence, the officer defendants seized the Canteles' home within the meaning of the Fourth Amendment. While the factual context of the Canteles' experience is not so dramatic—the police officers ordered the Canteles to leave rather than physically removing their home—the result of the officers' actions was no different: the Canteles were temporarily deprived of possession of their home. Under *Soldal*, that is a quintessential Fourth Amendment seizure. *Id.* at 61 ("we have emphasized that at the very core of the Fourth Amendment stands the right of a man to retreat into his own home") (internal quotation marks omitted); *see also United States v. Etchin*, 614 F.3d 726, 733 (7th Cir. 2010) ("The sanctity of the home is a central concern of the Fourth Amendment.").

Nevertheless, the defendants argue that the Fourth Amendment is not implicated because they did not "evict" the Canteles as that term is defined by the Illinois Forcible Entry and Detainer Act. Instead, they assert, they simply asked the Canteles to "temporarily depart from the premises while safety permit concerns were determined by the building department." Defs.' Mot. to Dismiss Pls.' Am. Compl., ECF No. 14, 9.

There are several problems with this argument. First, what does the Forcible Entry and Detainer Act, or the meaning of "eviction" under that Act, have to do with the question of

---

[7] In so holding, the Supreme Court reversed the holding of an *en banc* majority of the Seventh Circuit that there had been no seizure of the trailer within the meaning of the Fourth Amendment because the deputies' action had not compromised Soldal's privacy. *Id.* at 62.

whether there has been a "seizure" within the meaning of the Fourth Amendment?[8] The Supreme Court's holding in *Soldal* was not premised on a determination that there had been an "eviction" under the Act. What governed the Court's determination that a seizure had taken place was not that there had been an eviction *per se*, but rather that, in assisting the park owner, the deputies had meaningfully interfered with the Soldal's possessory interest in their home. Whether that interference constituted an eviction under state law was, and is, beside the point. *See, e.g., California v. Greenwood*, 486 U.S. 35, 43 (1988) ( "We have never intimated, however, that whether or not a search is reasonable within the meaning of the Fourth Amendment depends on the law of the particular State in which the search occurs.").

Second, whether the officers intended to "evict" the Canteles pursuant to the Act, or just to force them to temporarily vacate the premises, does not matter. The subjective intent of the officers (whatever it may have been) is simply irrelevant to the question of whether an unreasonable seizure occurred, as that question is subject to an objective, rather than subjective, standard. *Bond v. United States,* 529 U.S. 334, 338 n. 2 (2000) (in evaluating Fourth Amendment claim "the issue is not the [officers'] state of mind, but the objective effect of his actions."); *Soldal*, 506 U.S. at 69 ("[W]hy an officer might enter a house or effectuate a seizure is wholly irrelevant . . . the right against unreasonable seizures would be no less transgressed if the seizure of the house was undertaken to collect evidence, verify compliance with a housing regulation, effect an eviction by the police, or on a whim."). Thus, even if the defendant officers believed

---

[8] It is not even clear that the Act would even apply in this context. By its terms, the Act primarily governs the eviction process applicable to landlord-tenant disputes about the possession of property; the Court has found no cases (and the defendants cite none) in which the Act was applied by a municipality to effect an eviction premised on failure to comply with local codes or other safety ordinances.

they were engaged in a lawful eviction under state law, that belief has no bearing on the Canteles' Fourth Amendment claim.

And perhaps most significant, the defendants' characterization of the interaction with the Canteles distorts the allegations set forth in the complaint, which must of course be taken as true for purposes of assessing their motion. *See Erickson*, 551 U.S. at 94. Simply put, the complaint does not allege that the officers politely explained to the Canteles that there were safety issues relating to their home that required them to temporarily vacate the premises. The fair inference from the complaint is that the officers obtained instructions from someone at the Building Commission to tell the Canteles to get out and stay out. And while the Court is required to treat the complaint's allegations as true, it is worth noting that the defendant's unsupported twist on the dialog lacks credibility, as the putative safety issues that purportedly required the Canteles to vacate the premises apparently remained unremedied and posed no obstacle to the Canteles' return to the property later that day.

Which brings us to the defendants' contention that there was no seizure of the Canteles' home because they left the premises voluntarily. That argument borders on the frivolous, particularly since the defendants advance it in a motion to dismiss where the facts alleged by the plaintiffs must be taken as true. Whether a party has consented to a seizure is a question of fact that turns on the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 221 (1973). And here, the complaint alleges ample facts that support a plausible inference that the Canteles did not leave their residence voluntarily but were compelled to do so by the actions of the defendant officers. The complaint alleges that, after talking to someone at the Building Commission, "Officer Golden and Officer Fitzmaurice [supported by two other officers] returned to the front door of the subject property and demanded that all occupants leave the premises or

they would be taken off the premises." Am. Compl. ¶ 35. The defendants would not allow the plaintiffs to remove personal items or pets from the premises, only baby formula. *Id.* at ¶ 37. The defendants demanded that Amy Cantele remove her vehicle from the property. *Id.* at ¶¶ 38-39. They told the Canteles that they were prohibited from returning to the residence and that they would take further action against anyone who attempted to enter the residence. *Id.* at ¶ 40. A squad car was stationed at the end of the block to ensure that the Canteles did not return to the residence. *Id.* at ¶ 44. One of the officers even suggested that the Canteles would be out of the home so long that their cat might die, *id.* at ¶ 41, and it is difficult to imagine (even if you're not a cat lover) that the Canteles left voluntarily after hearing that comment. All of these facts support an inference that the Canteles left their home at the command of the defendant officers rather than voluntarily.[9]

There are, moreover, no countervailing facts alleged, or available to the defendants at this stage, to suggest that any reasonable person would have understood that they were free to remain in their home. Coerced consent is not voluntary consent. *Schneckloth*, 412 U.S. at 228 ("[T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against

---

[9] The defendants also argue that the complaint fails to differentiate adequately between their actions, and that at most they could have kept the Canteles out of their home for only the 38 minutes or so that they were at the property. The complaint alleges that the defendant officers were acting in concert, however, conspiring to evict them, and specifically actions that one or both officers took while at the residence. These allegations are sufficient to plausibly allege that both officers participated in removing the Canteles from the residence. And putting aside the fact that they offer no authority for the proposition that the seizure of a home for 38 minutes is a *de minimis* intrusion that does not rise to constitutional magnitude, there is nothing in the complaint that permits an inference that the Canteles were able to return to their home as soon as the officers left.

which the Fourth Amendment is directed."). Here, there was nothing subtle about the import of the officers' commands and, assuming the allegations of the complaint to be true, neither the Canteles nor any other reasonable person would have believed that they were free to ignore the commands of the defendant officers to vacate the home. And by preventing the Canteles from occupying their residence—from "retreating into [their] own home"—the defendant officers seized that home within the meaning of the Fourth Amendment. *Soldal,* 506 U.S. at 61.

The defendants also maintain that if any seizure of the Canteles' home occurred, it was reasonable. "[T]he Fourth Amendment proscribes searches and seizures only when they are unreasonable." *United Sates v. Jackson*, 598 F.3d 340, 346 (7th Cir. 2010) (citing *Florida v. Jimeno*, 500 U.S. 248, 250 (1991)). "In the typical case, a seizure of personal property is per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *Jackson*, 598 F.3d at 346 (internal quotation marks and punctuation omitted). Here, it is uncontested that the defendants lacked a warrant when they seized the Canteles' home, making that seizure presumptively unreasonable. The defendants identify no exception to the warrant requirement, other than the issue of consent discussed above, that could rebut that presumption.

The defendants rely on *White v. City of Markham*, 310 F.3d 989, 995 (7th Cir. 2002), and *Lumini v. Grayeb*, 184 Fed. App'x 559 (7th Cir. 2006), to argue that it was reasonable for the defendant officers to remove the Canteles from the residence because they were "protecting the safety of individuals and residences in their jurisdiction." ECF No. 14 at 12. Both cases, however, are inapposite as they involved analysis of whether there was a reasonable seizure of an occupant of a residence, not the residence itself, when police intervened to keep the peace in violent domestic disputes and directed the occupants with the apparently inferior possessory

interests to leave the premises. This case involves no such dispute and no such emergency. The defendants maintain that, like the defendant officers in *White* and *Lumini*, they were performing a community caretaking function in removing occupants from a residence that presented an immediate safety hazard, but there are no facts alleged in the complaint that support that characterization of the events. To the contrary, the picture drawn by the complaint is that the Canteles had been working cooperatively with the City to comply with code requirements. Further belying any inference that any non-compliance was compromising the safety of the Canteles' residence, or any other, are the allegations that another hearing had been scheduled to take place almost a month later and that the Canteles were permitted to return to their "unsafe" residence later the same day. Given these allegations, there is no basis to infer that a public safety emergency validated the defendants' actions. Perhaps the defendants ultimately will adduce evidence establishing that they acted reasonably to preserve public safety by removing the Canteles from their home, but the allegations of the complaint—by which the viability of the complaint must be measured—do not support that theory presently.

Accordingly, the Canteles have plausibly alleged that the defendant officers unreasonably seized their residence in violation of the Fourth Amendment.[10]

### C. Qualified Immunity

The defendant officers also assert that they are entitled to qualified immunity. That defense fails at present, for largely the same reasons that undergird the conclusion that the complaint presents a plausible Fourth Amendment claim: under *Soldal,* "being unceremoniously

---

[10] For the reasons discussed in connection with the Canteles' procedural due process claim, the Canteles have not plausibly alleged that the City has a policy or practice of seizing, without any sort of adjudication, the homes of residents who are alleged to be in violation of municipal codes or ordinances.

dispossessed of one's home" plainly constitutes "a seizure invoking the protection of the Fourth Amendment," 506 U.S. at 61, and whether the officers' actions in effecting that seizure were reasonable requires factual development.

Under the doctrine of qualified immunity, "'governmental officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir. 1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To overcome a claim of qualified immunity, the plaintiff must show (1) the defendants violated a constitutional right, and (2) that the right was clearly established at the time of the defendants' conduct. *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 473 (7th Cir. 2011).

In support of their contention that the Canteles' Fourth Amendment right to the possession their home was not clearly at established at the time the defendants asked the Canteles to leave, the defendants point to a line of cases involving the seizure of persons not property. *See Spiegel v. City of Chicago*, 106 F.3d 209 (7th Cir 1997) (law did not clearly establish that plaintiffs' persons were seized when officers told them they had to leave their home); *Kernats v. O'Sullivan*, 35 F.3d 1171, 1181 (7th Cir. 1994) (law did not clearly establish that plaintiffs' persons were seized when officers told them they had to leave their home).

But here, as discussed above, the Canteles do not assert that their persons were seized but instead argue that their possessory interest in their home was interfered with, making the defendants' authority inapposite. It is well established (and was at the time of the events at issue in this case) that one has a Fourth Amendment right to the use and enjoyment of their home and that a material interference with the right of possession constitutes a seizure within the meaning

of the Fourth Amendment. In *Soldal,* the Supreme Court held that the defendants had seized the plaintiff's home, within the meaning of the Fourth Amendment, when they helped a property owner physically remove the plaintiff's trailer home from its foundation and transported it to another location. *Soldal*, 506 U.S. at 72. In reiterating that the sanctity of the home is a cornerstone of the Fourth Amendment, the Court indicated "We fail to see how being unceremoniously disposed of one's home . . . can be viewed as anything but a seizure invoking the protection of the Fourth Amendment." *Id.* at 61; *see also Perry v. Sheahan*, 222 F.3d 309, 316 (7th Cir. 2000) (court noting the defendant police officers' argument that no established law prevented the warrantless seizure of property during an eviction was "stunning, and ignores virtually all Fourth Amendment law."). It was, in short, clearly established at the time of the events at issue in this case that evicting someone from their home without a warrant or other court authorization constitutes a Fourth Amendment seizure. *Hansen v. Cannon*, 122 F. App'x 265, 271 (7th Cir. 2004); *see also, e.g., Cochran v. Gilliam*, 656 F.3d 300, 310 (6th Cir. 2011) (citing *Soldal* as basis for affirming denial of summary judgment for officers on qualified immunity defense "where officers take an active role in a seizure or eviction" lacking judicial authorization or exigency); *Dixon v. Lowery*, 302 F. 3d 857, 866-67 (8th Cir. 2002) (affirming, based on *Soldal,* denial of summary judgment for officers on qualified immunity defense where officers helped a private party acquire possession of property).

As noted, however, the seizure of the Canteles' home might have been reasonable if justified by legitimate public safety concerns or some other exigency. The facts alleged in the complaint plausibly suggest otherwise, however, so the immunity defense cannot prevail at this juncture. *See* ECF No. 13, ¶¶ 23-51; *cf. Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (reversing grant of summary judgment on qualified immunity grounds based on lower court's failure to

draw reasonable inferences in favor of the plaintiff; "Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even when, as here, a court decides only the clearly-established prong of the standard."). What the defendants understood about the basis and authorization for their actions is a subject for discovery, and the evidence relating to that question of fact will inform the legal analysis of whether that understanding was contrary to clearly established law.

### D. Substantive Due Process

Recognition that the complaint states a valid Fourth Amendment claim requires dismissal of the Canteles' substantive due process claim. Where "the Fourth Amendment provides an explicit textual source of constitutional protection against . . . physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Graham v. Connor*, 490 U.S. 386, 395 (U.S. 1989). *See also,e.g., Belcher v. Norton*, 497 F.3d 742, 754 (7th Cir. 2007) (if the defendants' "actions fall clearly within the ambit of those activities regulated by the Fourth Amendment, the Fourth Amendment provides the appropriate standard for evaluating the claim, and there is no need for the district court to further analyze the case under the strictures of the Fourteenth Amendment") (quoting *Kernats v. O'Sullivan*, 35 F.3d 1171, 1182 (7th Cir. 1994)). The crux of the Canteles' allegations is that Golden and Fitzmaurice unreasonably interfered with their possessory interest in their home. Given that this sort of conduct falls well within the purview of the Fourth Amendment, the Canteles cannot proceed on a substantive due process theory in addition to their Fourth Amendment claim. Accordingly, the defendants' motion to dismiss the substantive due process claim is granted.

* * *

For the foregoing reasons, the defendants' motion to dismiss is granted with respect to the Canteles' procedural and substantive due process claims and their *Monell* claims against the City of Burbank. The procedural due process and *Monell* claims are dismissed without prejudice; the substantive due process claim is dismissed with prejudice. The motion to dismiss is denied, however, with respect to the Canteles' Fourth Amendment claim against Golden and Fitzmaurice in their individual capacities. The plaintiffs are granted leave to file an amended complaint within 21 days; the defendants are not required to respond to the current complaint; their response(s) to any amended complaint will be due 21 days after it has been filed. The Court will set a status hearing once the further procedural posture of the case takes shape.

Date: May 13, 2016

_____
John J. Tharp, Jr.
United States District Judge